*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TYRIONE ISAIAH HENRIQUES,

        Defendant-Appellant.

UNPUBLISHED
September 14, 2023

No. 359614
Allegan Circuit Court
LC No. 2019-022477-FC

Before: SWARTZLE, P.J., and O'BRIEN and FEENEY, JJ.

PER CURIAM.

After a four-day trial, a jury convicted defendant, Tyrione Isaiah Henriques, of unlawful imprisonment, MCL 750.349b; two counts of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(b) (force or coercion); domestic violence, MCL 750.81(2); torture, MCL 750.85; and assault with a dangerous weapon, MCL 750.82.[1] The trial court sentenced defendant to terms of imprisonment of 8 to 15 years for unlawful imprisonment, 10 to 15 years for each CSC-III conviction, 93 days for domestic violence, 23 to 60 years for torture, and 365 days for assault with a dangerous weapon. On appeal, defendant argues that his trial counsel rendered ineffective assistance by failing to request a specific unanimity instruction on the charge of torture, failing to object to inadmissible hearsay testimony, and failing to file an interlocutory appeal after the circuit court reinstated certain charges dismissed by the district court. For the reasons explained in this opinion, while retaining jurisdiction, we remand this case to the trial court to conduct a *Ginther*[2] hearing on two of these three claims.[3]

---

[1] The jury acquitted defendant of two counts of assault with intent to do great bodily harm less than murder or by strangulation, MCL 750.84.

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] Defendant raises several other claims on appeal which are not addressed in this opinion. Those issues will be fully addressed after remand as necessary.

# I.  BASIC FACTS

The victim lived with defendant, his parents, siblings, and half siblings from sometime in March 2018 until on or about December 19, 2018.  The victim met defendant on Facebook, and they bonded over their mutual love of music.  The victim was charmed by defendant's attraction to her.  Initially, their relationship was good, and the victim moved in with defendant.  At trial, the victim testified that soon after she moved in with defendant, he began abusing her.  According to the victim, defendant punched her while calling her degrading names, stabbed her with scissors, made her sleep on a mattress in a shed behind the house during the winter, and beat her with a belt.  The victim testified that defendant also confined her to the room that they shared, made her urinate in cups, and then made her stand in a corner while he poured the urine on her.  The victim further testified that defendant sprayed Raid and a hair-dye chemical on her arms; made her stand in a corner of their room for hours, sometimes days; shot her with a BB gun as she walked to the shed to sleep; sometimes forced her to have sex; threatened her and her family; choked her to the point of unconsciousness; and live-streamed her performing oral sex on him.  During these months, the victim lost about 60 pounds.  When the victim finally left defendant's home, she returned to her mother's house in another county.  After serving 20 to 30 days in jail for reasons that are not clear from the record, the victim and her mother went to the Allegan City Police and reported defendant's abuse.

## A.  PRETRIAL

Defendant was arrested on January 14, 2019.  He was arraigned the following day on eight counts: Count 1 for torture; Count 2 for unlawful imprisonment; Counts 3 and 4 for CSC-III; Counts 5 and 6 for assault with intent to do great bodily harm less than murder (AWIGBH) or assault by strangulation; Count 7 for assault with a dangerous weapon; and Count 8 for domestic violence.  After a two-day preliminary examination, the district court dismissed Count 1 (torture), Count 4 (AWIGBH or assault by strangulation), and Count 7 (assault with a dangerous weapon) without prejudice.  The district court bound over defendant on the remaining charges.  Once in the circuit court, the prosecution moved to amend the information to reinstate the dismissed charges, and the circuit court granted the prosecution's request.  The prosecution also filed notice of its intent to introduce evidence of other wrongful acts under MCL 768.27b and MRE 404(b).  The other-acts evidence that the prosecution planned to admit arose from the victim's preliminary-examination testimony.  The prosecution later amended its notice to include other-acts testimony from Marissa Rockett, defendant's girlfriend after the victim.  The circuit court ultimately granted the prosecution's motion to admit other-acts evidence.

## B.  TRIAL

At trial, in addition to hearing from the victim, the principal witnesses for the prosecution included Patricia Haist, the director of crisis intervention services at the YWCA in Grand Rapids, who testified as an expert in domestic violence and sexual-assault-victim dynamics.  Haist testified about the multitude of ways that an abusive domestic partner exercises power and control over the victim-partner, how victims of domestic violence often respond, and the ways victims of domestic violence reveal the abuse.  Regarding the latter, Haist testified that victims reveal the abuse when they are ready, and that their revelations are typically incremental.  According to Haist, initial

disclosures are not always full disclosures, and, if abuse occurred over a long period, victims are less likely to recall every detail and multiple incidents may run together. Haist testified that it was common for victims to minimize the violence they experienced, especially at the hands of an intimate partner whom they cared about or who they thought cared about them. Haist also testified that victims might try to protect the abuser by withholding details or lying about the assault, and that victims sometimes stayed with their abusers because it could be more dangerous to leave.

The jury also heard from Bonnie Christopher, a sexual assault nurse examiner (SANE), Allegan City Police Officer Josh Morgan, and Allegan City Police Officer Matthew Luyk. Christopher, who examined the victim at the request of the police department, testified about what the victim revealed—and did not reveal—during the examination. Officer Morgan, who was the lead investigator on the case, testified about the victim's report of defendant's abuse and about photographs that were taken of the injuries to the victim's body. Officer Luyk's testimony focused on introducing the prosecution's other-acts evidence. Officer Luyk testified that, in July 2019, he performed a welfare check on Rockett, who was in a dating relationship with defendant at the time and was staying at defendant's house. When Officer Luyk saw Rockett during the welfare check, she was wearing makeup. An hour after the welfare check, Officer Luyk was called to the sheriff's station in Allegan, where he encountered Rockett again, and by this time she had removed the makeup that she was wearing at the welfare check, and the officer could see bruising on much of her left eyelid. According to Officer Luyk, while Rockett was still at the station, defendant arrived, said that Rockett was his girlfriend and that he wanted to see her, and stated that her mother said that Rockett could leave with him. Officer Luyk told defendant that he, too, had spoken with Rockett's mother and that she did not want Rockett going with defendant. Officer Luyk testified that defendant did not respond and left the sheriff's station. The victim testified that she saw bruises on Rockett's arm and body in the same place where the victim had bruises, and also saw Rockett when she had a black eye.

Witnesses for the defense included defendant's mother, stepfather, and half-sister. The latter testified that 10 people lived in the house when the victim was there. Defendant's half-sister said that the victim was her best friend while she was there and that she talked to the victim and watched television with her every day. She also said that the victim was part of the family and would go with them to the mall, to restaurants, and to get their nails done. According to defendant's half-sister, the victim was always happy and smiling, and she never wanted to leave defendant's side. The witness described the relationship between defendant and the victim as "quite good"; they made music videos together and took pictures together, and the victim would cook and do laundry for defendant. Defendant's half-sister said that she never saw defendant hit the victim, never heard any sounds of distress coming from the room that the victim and defendant shared, and never saw the victim standing in the room for days. She also said that there never was a time when the victim looked or smelled bad, and that the victim took a shower and did her hair and makeup every day.

Defendant's stepfather testified that the victim was considered a member of the family while she lived there; she ate with the family, often went with them to the store or the mall, and slept in defendant's room. Defendant's step-father also said that the victim was free to go about the house, and no one ever prevented her from eating food at the house. He further testified that he never saw defendant hit the victim, he never heard screams or shrills coming from their room or anywhere in the house, and he never saw defendant hit the victim with a belt or spray her with

-3-

Raid. He also never smelled urine when he went into defendant's room, nor did he ever smell urine emanating from the victim or see burn marks, scrapes, or bruises on her arms.

Defendant's mother testified similarly, stating that the victim became like one of her daughters. She said that she never heard screaming, beating, or anything unusual coming from defendant's room, and she never saw defendant hit or push the victim. Defendant's mother testified that she never smelled urine emanating from defendant's room or from the victim's person, she never noticed any urine stains on defendant's carpet, she never smelled Raid or saw defendant spray Raid on the victim, and she never saw any burn marks on the victim arms.

The jury convicted defendant as stated. Before sentencing, defendant moved for a new trial. However, after several hearings were adjourned and defendant could not produce Rockett—the witness whose testimony was the basis for his motion for a new trial—the trial court denied the motion. This appeal followed.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

On appeal, defendant raises three claims of ineffective assistance. This Court has explained the review of such claims as follows:

> Ordinarily, whether a defendant has been denied effective assistance of counsel is a mixed question of fact and law—the trial court's factual findings supporting its decision are reviewed for clear error, while the court's determination of whether those facts violated the defendant's right to the effective assistance of counsel is reviewed de novo. Defendant, however, failed to obtain an evidentiary hearing to expand the record, so there are no factual findings to which this Court must defer, and this Court's review is instead limited to errors apparent on the record. [*People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021) (quotation marks and citation omitted).]

"To establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Id.* (quotation marks and citation omitted).

## A. INSTRUCTIONAL ERROR

Defendant first argues that his counsel provided ineffective assistance by failing to ask for a specific unanimity instruction on the charge of torture.[4]

---

[4] Defendant also argues that his counsel's error amounted to plain error affecting his substantial rights. However, substantively, defense counsel expressly approved the trial court's instructions to the jury, thereby waiving any objection to an erroneous instruction. See *People v Kowalski*, 489 Mich 488, 504; 803 NW2d 200 (2011).

"Criminal defendants are guaranteed a unanimous jury verdict under the state constitution." *People v Gadomski*, 232 Mich App 24, 30; 592 NW2d 75 (1998), citing Const 1963, art 1, § 14. "In order to protect a defendant's right to a unanimous verdict, it is the duty of the trial court to properly instruct the jury regarding the unanimity requirement." *People v Cooks*, 446 Mich 503, 511; 521 NW2d 275 (1994). "Often, the trial court fulfills that duty by providing the jury with a general instruction on unanimity." *People v Chelmicki*, 305 Mich App 58, 68; 850 NW2d 612 (2014). However, "when the state offers evidence of multiple acts by a defendant, each of which would satisfy the actus reus element of a single charged offense, the trial court is required to instruct the jury that it must unanimously agree on the same specific act if the acts are materially distinct or if there is reason to believe the jurors may be confused or disagree about the factual basis of the defendant's guilt." *Cooks*, 446 Mich at 530.

Defendant contends that he was entitled to a specific unanimity instruction on the charge of torture. MCL 750.85(1) states, "A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture . . . ." Thus, torture can be proved by establishing that (1) the defendant "with the intent to cause cruel or extreme physical or mental pain and suffering, inflict[ed] great bodily injury . . . upon [the victim]" while she was under his physical control or (2) the defendant "with the intent to cause cruel or extreme physical or mental pain and suffering, inflict[ed] . . . severe mental pain or suffering upon [the victim]" while she was under his physical control. MCL 750.85(1).

At defendant's trial, the prosecution argued that defendant committed the crime of torture both ways, and it cited materially distinct evidence in support of each theory. The prosecution argued that defendant tortured the victim by inflicting great bodily harm upon her based on the victim's testimony that "[s]he was stabbed, sprayed with Raid, burned with chemicals on her arms from hair dye—er, hair vol—I think volumizer was used. Some sort of chemical. She indicated it burned." The prosecution also pointed to evidence that the victim "had severe cuts" and "multiple puncture wounds," her testimony that she was stabbed with scissors, and "[t]he slice up in her thigh." The prosecution alternatively argued that defendant tortured the victim by causing severe mental pain or suffering based on the victim's testimony that defendant "threatened to kill her and her family," and that this made her so frightened that "she was going to jump out the window." The prosecution also pointed to the victim's testimony that the victim attempted to "pretend to commit suicide to get out of that house[.]" After the jury listened to the prosecutor's closing arguments, the trial court instructed the jury that, to find defendant guilty of torture, it was required to find the following:

> First, that the Defendant had custody or physical control over [the victim]. This means the Defendant used force or threat of force, either to confine [the victim] by interfering with her liberty, or to restrict [the victim's] freedom of movement.
>
> Second, that the Defendant exercised custody or physical control over [the victim] without her consent or without lawful authority to do so.
>
> *Third, that at the time the Defendant had custody or physical control over [the victim], he intentionally caused great bodily injury and or severe mental pain*

*or suffering to [the victim]. Great bodily injury means internal injury, poisoning, serious burns or scalding, severe cuts, or multiple puncture wounds.*

*Severe mental pain or suffering means a substantial chain [sic] in—change in mental functioning that can be perceived by another person. It must be caused by the Defendant in one or more of the following ways. Intentionally causing great bodily injury to [the victim] or threatening to cause bodily harm to her, threatening [the victim] with imminent death, threatening another person will imminently be killed, subjected to greater bodily [harm], or given a mind-altering substance meant to disrupt the senses or personality.*

*Fourth, that the Defendant intended to cause [the victim] to suffer cruel or extreme physical pain or mental pain and suffering. Does—the Prosecutor does not need to prove that [the victim] actually suffered any pain. [Emphasis added.]*

Despite the prosecution's argument that defendant committed torture by inflicting both (1) great bodily harm and (2) severe mental pain or suffering upon the victim, and the trial court's instructions reflecting that defendant could be convicted of torture under either theory, defendant was only charged with a single count of torture. It follows that, because (1) the prosecution offered evidence of multiple acts of defendant, each of which would satisfy the actus reus element of the single charge of torture, (2) the prosecution argued that defendant committed the crime of torture in both ways, and (3) the evidence that the prosecution relied on in support of each theory was materially distinct, "the trial court [was] required to instruct the jury that it must unanimously agree on the same specific act . . . ." *Cooks*, 446 Mich at 530.[5]

---

[5] On appeal, the prosecution directs this Court's attention to the fact that "it is well settled that when a statute lists alternative means of committing an offense, which means in and of themselves do not constitute separate and distinct offenses, jury unanimity is not required with regard to the alternate theories." *Gadomski*, 232 Mich App at 31. The prosecution misunderstands the significance of *Gadomski*, however. *Gadomski* is a "multitheory" case, while this case is a "multiple acts" or "separate acts" case. See *People v Lynn*, 223 Mich App 364, 367 n 1; 566 NW2d 45 (1997). Addressing this distinction, our Supreme Court explained that "multitheory" cases address "[w]hen a statute lists alternative means of committing an offense which in and of themselves do not constitute separate and distinct offenses . . . ." *Cooks*, 446 Mich at 515 n 16 (quotation marks and citation omitted). That question is "analytically distinct" from the question addressed in *Cooks* (and this case), which is "whether the trial court's general unanimity instruction sufficiently protected defendant's right to a unanimous verdict, in light of the allegations of separate acts by the defendant, each of which would factually satisfy the elements of the charged offense." *Id*.

To give examples of this distinction, in *Gadomski*, the defendant was convicted of a single count of CSC-I. "[T]he trial court instructed the jury that in order to find defendant guilty, it was required to find that defendant engaged in the specific act of sexual penetration alleged by the prosecution and that this act was accompanied by one of three alternative aggravating circumstances." *Gadomski*, 232 Mich App at 29. The question on appeal was whether defendant

The prosecution contends that, regardless of whether a specific unanimity instruction was required, defense counsel's decision to not request such an instruction was trial strategy. According to the prosecution, defense counsel likely feared that such an instruction would plant the idea with jurors that they could credit only some parts of the victim's testimony, which ran counter to counsel's strategy of discrediting the victim's testimony in its entirety.

Defense "counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). For that reason, this Court will generally "not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). However, a strategy "in fact must be sound, and counsel's decisions as to it objectively reasonable; 'a court cannot insulate the review of counsel's performance by calling it trial strategy.' " *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014), quoting *Trakhtenberg*, 493 Mich at 52.

There are instances in which it is reasonable trial strategy for defense counsel to not request an otherwise-required instruction, particularly where, like here, the defendant's defense is actual innocence. See, e.g., *People v Robinson*, 154 Mich App 92, 94; 397 NW2d 229 (1986). Moreover, as the prosecution points out on appeal, our Supreme Court has held that where a defendant's defense is that there is reasonable doubt whether he committed the alleged crime, and that defense hinges on the credibility of the accuser, then the "failure to give an instruction requiring unanimity on a particular act in no way impede[s] the defense or denie[s] the defendant a fair trial." *People v Van Dorsten*, 441 Mich 540, 545; 494 NW2d 737 (1993).[6] Thus, if defense counsel's failure to request a specific unanimity instruction was indeed trial strategy as the prosecution argues, it may have been reasonable.

---

was entitled to a specific unanimity instruction with respect to the aggravating circumstances. This Court explained that defendant was not entitled to such an instruction because "[w]here there is a single sexual penetration, the various aggravating circumstances listed in MCL 750.520b constitute alternative means of proving a single CSC I offense, and would not support convictions of separate and distinct CSC I offenses." *Id*. at 31.

*Cooks*, in contrast, was a "separate acts" case because the "defendant was charged with one count of first-degree criminal sexual conduct, but testimony elicited from the complainant at trial referred to three incidents of sexual penetration." *Cooks*, 446 Mich at 505. Generally, in such cases, a specific unanimity instruction is required. *Id*. at 530 n 34. However, in *Cooks*, our Supreme Court held that a specific unanimity instruction was not required because (1) "the evidence offered . . . to support each of the alleged acts of penetration was materially identical," (2) the defendant "did not present a separate defense or offer materially distinct evidence of impeachment regarding any particular act," and (3) there was no "indication of juror confusion or disagreement over the existence of any alternative acts[.]" *Id*. at 528-529.

[6] We stress, however, that just because the failure to give a specific unanimity instruction may not impede the defense or deny a defendant a fair trial does not necessarily make the failure to request the instruction reasonable.

However, on the record before us, we are neither convinced that the failure to request the instruction was trial strategy, nor that such a strategy (if it was strategy) was reasonable. Nevertheless, giving credence to the prosecution's argument, we remand this issue to the trial court for a *Ginther* hearing, at which defendant's trial counsel can explain whether his failure to request a specific unanimity instruction on the charge of torture was trial strategy. If it was, the trial court is instructed to address the reasonableness of that strategy, and if it concludes that the strategy was unreasonable, to address whether counsel's deficient performance prejudiced defendant. *Haynes*, 338 Mich App 392. Alternatively, if defense counsel's failure to request a specific unanimity instruction on the charge of torture was not trial strategy, then the failure to do so clearly fell below an objective standard of reasonableness, and the trial court shall address whether counsel's deficient performance prejudiced defendant. *Id*.

## B. SEXUAL ASSAULT NURSE EXAMINER'S TESTIMONY

Defendant next contends that defense counsel rendered deficient performance by not objecting to Christopher's testimony about what the victim told Christopher during the SANE's examination of the victim. Because we conclude that much of Christopher's testimony about what the victim said to Christopher during her examination was inadmissible hearsay, we direct the trial court to also address this issue at the *Ginther* hearing on remand.

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and it is generally inadmissible unless it falls under one of the exceptions provided by the rules of evidence. MRE 801(c); MRE 802. One such exception is MRE 803(4), which allows statements made for purposes of medical treatment "if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care." *People v Mahone*, 294 Mich App 208, 214-215; 816 NW2d 436 (2011). The "rationale for MRE 803(4) is the existence of (1) the self-interested motivation to speak the truth to treating physicians in order to receive proper medical care, and (2) the reasonable necessity of the statement to the diagnosis and treatment of the patient." *People v Duenaz*, 306 Mich App 85, 95; 854 NW2d 531 (2014) (quotation marks and citation omitted).

Christopher's examination of the victim occurred nearly a month after the victim said that she last had (consensual) sexual contact with defendant, an unknown time since the victim said that defendant sexually assaulted her anally, and after the victim reported the abuse to the police. Both Christopher and Officer Morgan testified that police referred the victim to the examination center for investigative purposes. Officer Morgan explicitly testified that he asked the victim to get a sexual assault examination to determine whether there were signs of forcible penetration. Both the timing of the referral and the fact that the referral was requested for investigative purposes weigh against the applicability of MRE 803(4). See *People v Shaw*, 315 Mich App 668, 675; 892 NW2d 15 (2016) (determining that MRE 803(4) did not apply because the examination occurred years after the alleged assault and the police referred the victim to the medical professional in conjunction with the police's investigation). Further, some of the victim's statements regarding acts of domestic violence that occurred over several months and were unconnected to sexual assault (such as that defendant urinated on her, sprayed her with Raid, made her stand in a corner for days, accused her of cheating, and stabbed her in the leg with scissors) were not reasonably necessary for medical diagnosis or treatment. Most notably, Christopher's testimony that the

victim identified defendant as her abuser certainly cannot be said to fall under MRE 803(4)'s exception to the hearsay rule. We therefore conclude that, at the very least, these portions of Christopher's testimony constituted hearsay that fell outside MRE 803(4). Stated differently, the hearsay statements were inadmissible. MRE 802. Despite this, defendant's trial counsel permitted the statements to be entered into evidence without objection.

We acknowledge that there may have been strategic reasons for allowing Christopher's hearsay testimony into evidence, but given that we are already remanding this case to the trial court for a *Ginther* hearing on defendant's other ineffective assistance claim, we decline to conceive of strategic reasons defense counsel may have had for allowing Christopher's hearsay testimony to be admitted. Cf. *Haynes*, 338 Mich App at 429-430 ("If this Court can conceive of a legitimate strategic reason for trial counsel's act or omission, this Court cannot conclude that the act or omission fell below an objective standard of reasonableness."). Instead, we will allow defendant's trial counsel to explain those reasons in the first instance. After hearing from defendant's trial counsel, the trial court shall decide whether defense counsel's failure to object to Christopher's hearsay testimony fell below an objective standard of reasonableness, and if so, whether counsel's deficient performance prejudiced defendant.

## C. REINSTATEMENT OF DISMISSED CHARGES

For his third and final ineffective-assistance claim, defendant argues that defense counsel rendered ineffective assistance of counsel by failing to file an interlocutory appeal challenging the circuit court's reinstatement of charges dismissed by the district court. We disagree.

MCR 6.112(H) provides, "The court before, during, or after trial may permit the prosecutor to amend the information . . . unless the proposed amendment would unfairly surprise or prejudice the defendant." Here, the circuit court reinstated charges that were dismissed by the district court. As our Supreme Court has explained, once jurisdiction "vest[s] in the circuit court, the only legal obstacle to amending the information to reinstitute an *erroneously* dismissed charge is that amendment would unduly prejudice the defendant because of unfair surprise, inadequate notice, or insufficient opportunity to defend." *People v Goecke*, 457 Mich 442, 462; 579 NW2d 868 (1998) (quotation marks and citation omitted; emphasis added). The circuit court's standard of review when deciding whether to reinstate charges is for an abuse of discretion, meaning "that the circuit court may not substitute its judgment for that of the" district court. *Id*. It follows that, for defendant to establish a claim of ineffective assistance on grounds that his trial counsel should have filed an interlocutory appeal contesting the circuit court's reinstatement of dismissed charges, defendant must first show that the district court did not abuse its discretion by dismissing the charges in the first place.

"The right to a preliminary examination in Michigan is a creation of statute." *People v Hunt*, 442 Mich 359, 362; 501 NW2d 151 (1993). "The primary function of the preliminary examination is to determine whether a crime has been committed and, if so, whether there is probable cause to believe that the defendant committed it." *Id*. In other words, at a preliminary hearing, the prosecution must present evidence establishing that the defendant committed the charged crime, and the district court must find that probable cause exists to bind over the defendant for trial. *People v Francis*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 364998); slip op at 2. As explained by our Supreme Court:

The probable-cause standard of proof is, of course, less rigorous than the guilt-beyond-a-reasonable-doubt standard of proof. Probable cause requires a quantum of evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. Yet, to find probable cause, a magistrate need not be without doubts regarding guilt. The reason is that the gap between probable cause and guilt beyond a reasonable doubt is broad, and finding guilt beyond a reasonable doubt is the province of the jury. [*People v Yost*, 468 Mich 122, 126; 659 NW2d 604 (2003) (quotation marks and citation omitted).]

The district court dismissed three charges against defendant. It dismissed one count of assault by strangulation because the incident occurred outside the court's jurisdiction. It dismissed the charge of torture because it did not believe that the victim's injuries rose to the level of "great bodily harm." And it dismissed the charge of assault with a dangerous weapon based on its assessment of the victim's credibility.

We first briefly address defendant's claim that his trial counsel rendered ineffective assistance by failing to file an interlocutory appeal contesting the reinstatement of the assault-by-strangulation charge against defendant. We conclude that, regardless of whether counsel's failure to file an interlocutory appeal fell below an objective standard of reasonableness, defendant cannot establish prejudice with respect to this claim because the jury acquitted defendant of the charge.

We next turn to the district court's dismissal of the torture charge. As relevant here, to establish probable cause that defendant committed torture, the prosecution had to establish that defendant intentionally caused great bodily injury or severe mental pain or suffering to the victim. MCL 750.85(1). Relative to the instant appeal, "great bodily injury" includes "internal injury, poisoning, serious burns or scalding, severe cuts, or multiple puncture wounds." MCL 750.85(2)(c)(*ii*). The victim testified that defendant stabbed her multiple times with a pair of scissors—three times in her leg and twice in her arm—and that she had a gash on her ankle that still bled. The victim said that the scissors were "tall," but there is no evidence of the depth of the puncture wounds or that they required medical attention. The victim also testified that defendant sprayed her with Raid and with a hair-dye chemical that burned her skin and caused her to develop a burning, itchy rash. The rash lasted a day and was treatable with anti-itch cream. In its ruling, the district court acknowledged that this evidence showed "some sort of domestic violence type situation," but concluded that it did not "reach[] the level envisioned by the charge of torture" because it did not rise to the level of "great bodily harm." We question this reasoning because the district court did not address the victim's testimony that she was stabbed multiple times with scissors, which would seemingly satisfy MCL 750.85(2)(c)(*ii*)'s definition of "great bodily harm" as including "multiple puncture wounds." However, we need not decide the issue because we agree with the circuit court that the district court erroneously dismissed the torture charge because it did not consider whether evidence established that defendant caused the victim "severe mental pain or suffering."

MCL 750.85(2)(c) provides as follows:

-10-

(d) "Severe mental pain or suffering" means a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner caused by or resulting from any of the following:

(*i*) The intentional infliction or threatened infliction of great bodily injury.

(*ii*) The administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt the senses or the personality.

(*iii*) The threat of imminent death.

(*iv*) The threat that another person will imminently be subjected to death, great bodily injury, or the administration or application of mind-altering substances or other procedures calculated to disrupt the senses or personality.

The victim testified at the preliminary examination that, over the course of several months, defendant engaged in a series of violent and demeaning acts to force the victim to act in certain ways. The victim said that she eventually "got so numb to everything" that "[she] wasn't [her]self anymore." She also testified that she lost a significant amount of weight during this time.

When reinstating the torture charge, the circuit court noted that the district court only addressed torture if established through great bodily harm, acknowledged that torture could also be proven by severe mental pain or suffering, and concluded that the victim's testimony established probable cause that defendant inflicted severe mental pain or suffering on the victim as defined in MCL 750.85(2)(d)(*ii*). We agree with the circuit court that the district court abused its discretion by failing to address whether defendant committed torture by inflicting severe mental pain or suffering on the victim. We further agree with the circuit court that, based on the victim's testimony, there was probable cause to believe that defendant committed torture by inflicting severe mental pain or suffering on the victim as defined in MCL 750.85(2)(d)(*ii*). Accord *People v Schaw*, 288 Mich App 231, 232, 234-235; 791 NW2d 743 (2010) (holding that there was sufficient evidence for a jury to find beyond a reasonable doubt that defendant inflicted severe mental pain or suffering when he "choked and restrained [the victim], held a knife to her neck, attempted to drug her, and threatened to kill her" based on the victim's testimony that the defendant's actions "put [her] in a state that [she] could not control," "scarred her," and "affected [her] substantially"). Accordingly, defendant's trial counsel was not ineffective when he failed to file an interlocutory appeal contesting the reinstatement of the torture charge against defendant because such an appeal would have been futile. *Haynes*, 338 Mich App at 416 n 2.

Lastly, the trial court dismissed the charge of assault with a dangerous weapon based on the court's finding that the victim's testimony was not credible. The district court found the victim lacking in credibility because she admitted that she lied to different people about the cause of her injuries and, even when she had an opportunity to tell someone about the abuse without defendant present, she either said nothing or, if she did reveal the abuse, she did not go into detail. It was proper for the district court to weigh the credibility of the witnesses, but a district court does not weigh credibility the same way that a jury does. As our Supreme Court has explained, the reason for this difference is rooted in the different standards applicable to each proceeding:

While a jury must find a defendant guilty *beyond a reasonable doubt*, a magistrate must only determine that there is *probable cause* to believe that the defendant has committed a crime. The gap between probable cause and guilt beyond a reasonable doubt is broad, and therefore, unlike a jury, a magistrate may legitimately find probable cause while personally entertaining some reservations regarding guilt. Accordingly, in considering the credibility of witnesses, a magistrate may only decline to bind over a defendant if a witness's lack of credibility, when considered together with the other evidence presented during the examination, would preclude a person of ordinary prudence and caution from conscientiously entertaining a reasonable belief of the accused's guilt. [*People v Anderson*, 501 Mich 175, 188; 912 NW2d 503 (2018) (quotation marks, citations, and brackets omitted).]

The victim's testimony, taken as a whole, raised a fact question regarding her credibility that should have been left for the jury. The victim acknowledged that she lied and that she did not tell anyone about the extent of defendant's abuse, but she explained that she lied in part because she loved defendant, thought he would change, and was trying to protect him. She testified that it was not until she went to jail and talked to women with similar experiences that she realized that defendant was not going to change. According to the victim, every single one of the women went through what she had gone through, and none of their partners changed. The district court determined that the victim was not credible on the basis that she provided different explanations for the injury on her ankle and did not seek help when she had the opportunity to do so. However, a district court is required to consider "all the evidence presented," *id*. at 178, and the evidence relative to the victim's credibility extended beyond her admission that she lied. It included testimony regarding the reasons for the lies and the circumstances that finally made her break with defendant. As the circuit court observed when reinstating the charge, it was not unusual for victims of domestic abuse to conceal that they were victims. Considering the victim's testimony as a whole "would not preclude a person of ordinary prudence and caution from conscientiously entertaining a reasonable belief of the accused's guilt" regarding the charge of assault with a dangerous weapon. *Id*. at 188. Accordingly, as with the reinstatement of defendant's torture charge, defendant's trial counsel was not ineffective when he failed to file an interlocutory appeal contesting the reinstatement of the assault-with-dangerous-weapon charge against defendant because such an appeal would have been futile. *Haynes*, 338 Mich App at 416 n 2.

## III. CONCLUSION

For the reasons explained in this opinion, we conclude that defendant was entitled to a specific unanimity instruction on the torture charge, and much of SANE Christopher's testimony constituted inadmissible hearsay. Yet defendant's trial counsel neither requested a specific unanimity instruction on the torture charge nor objected to Christopher's inadmissible testimony. Accordingly, while retaining jurisdiction, we remand this case to the trial court to conduct a *Ginther* hearing addressing whether defendant's trial counsel rendered ineffective assistance by (1) failing to request a specific unanimity instruction for the torture charge and (2) failing to object to Christopher's inadmissible hearsay testimony.

Remanded. We retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney

# Court of Appeals, State of Michigan

# ORDER

Brock A. Swartzle
Presiding Judge

People of MI v Tyrione Isaiah Henriques

Colleen A. O'Brien

Docket No.    359614

LC No.        2019-022477-FC

Kathleen A. Feeney
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence within 28 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, we direct the trial court to conduct a *Ginther* hearing addressing whether defendant's trial counsel rendered ineffective assistance by (1) failing to request a specific unanimity instruction for the torture charge and (2) failing to object to SANE Christopher's inadmissible hearsay testimony. The proceedings on remand are limited to this issue.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

_____
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

September 14, 2023
Date

_____
Chief Clerk